IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAVID HOLDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. **3:12-cv-01085-PMF** |
| ) | |
| THE ILLINOIS DEPARTMENT OF ) | |
| JUVENILE JUSTICE as operator of ) | |
| The ILLINOIS YOUTH CENTER, ) | |
| HARRISBURG, ) | |
| ) | |
| Defendant. ) | |

### ORDER

**FRAZIER, Magistrate Judge:**

Before the Court is defendant Illinois Department of Juvenile Justice's ("IDJJ") Motion for Summary Judgment (Doc. 56). Plaintiff David Holder filed a response in opposition (Doc. 63). In his complaint Holder asserts that the IDJJ discriminated against him on the basis of his race in violation of Title VII of the Human Rights Act of 1964 and retaled against him for filing complaints with the Equal Employment Opportunity Commission ("EEOC"). Holder's second amended complaint presents a haphazard intermingling of multiple causes of action into a single count ("Count 1"). Such practice conflicts with Fed.R.Civ.P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence … must be stated in a separate count…"). In the interest of clarity, Holder's single count will be broken up into separate claims. Holder's asserts claims that: 1) he was terminated because of his race, 2) he was terminated in retaliation for filing EEOC complaints, 3) he was not promoted because of his race, 4) he was not promoted in retaliation for filing EEOC complaints, 5) he was subject to investigations, discipline, and a hostile work environment because of his race, 6) he was subject

1

to investigations, discipline and a hostile work environment in retaliation for filing EEOC complaints, and 7) he was paid less than Caucasian employees. For the following reasons, the defendant's motion for summary judgment is granted for claims 3, 4, 5, 6 and 7. The defendant's motion for summary judgment is denied with respect to claims 1 and 2. There are genuine issues of material fact as to whether Holder was terminated because of his race and whether he was terminated in retaliation for filing EEOC complaints.

## I. BACKGROUND

When presented with a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). Without making any credibility determinations, the Court is required to view the facts in the light most favorable to the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). With that standard in mind, defendant IDJJ operates the Illinois Youth Center in Harrisburg, Illinois ("IYCH"), a medium security facility that houses male youth offenders. Plaintiff David Holder is an African American who was hired by the IDJJ for the position of Juvenile Justice Specialist at the IYCH in July, 1998. Holder is a veteran, has a bachelor's degree in criminal justice from Southern Illinois University, and speaks fluent Spanish. Holder contends that he was subject to a series of discriminatory and retaliatory actions by the defendant, culminating in his termination with the IDJJ on July 28, 2010.

The first dispute between the Holder and the IDJJ arose in regards to "Temporary Assignment" ("TA") positions at the IYCH. TA positions are, as their name suggests,

assignments where an employee is temporarily promoted to the next employment grade level.[1] Employees are not required to accept TA offers, but TA positions include an increase in wages and they allow employees to become familiar with the tasks and responsibilities of the higher level position. An employee with TA experience would be at a distinct advantage over those without TA experience whenever a permanent promotion opportunity became available.

From 1998 through 2002 Holder was not offered any TA positions, and he filed a complaint with the EEOC in December, 2002. In his complaint with the EEOC Holder alleged he was being discriminated against on account of his race and his age. The Complaint stated:

> "I have been employed by Respondent since 1998. I am currently a Youth Supervisor II. On a continuing basis I have been denied T/A III assignments. Younger, less senior, non-Black employees have been given assignments on a regular basis. Of the approximately 25-30 individuals given these assignments, only 1 is over age 40 and only 1 is Black. In addition, in about March 2002 I was given unwarranted discipline for reporting a rule violation committed by a non-Black Officer. No action was taken against this employee.
>
> I believe that I have been discriminated against by Respondent because of my race, Black, and my age, [46], in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act of 1967, as amended."

The Illinois Department of Corrections entered into a settlement agreement with Holder in May of 2003, and he received seven TA positions in 2003 and one in 2007.

Despite the settlement agreement, tension continued between Holder and his supervisors. On December 26, 2003 Holder filed another complaint with the EEOC. In the complaint he

---

[1] According to the affidavit of Hollie Zertuche, an IYCH employee from 1998 to 2012, the hierarchy of IYCH positions are as follows:
  Youth Supervisor Intern (Juvenile Justice Intern)
  Youth Supervisor II (Juvenile Justice Specialist)
  Youth Supervisor III
  Youth Supervisor IV  (Juvenile Justice Supervisor)
  Chief of Security
  Assistant Superintendent of Programs III
  Assistant Superintendent of Operations II
  Superintendent.

3

stated that he was being retaliated against for filing the previous complaint. The second EEOC complaint stated:

> "I am employed as a Youth Supervisor II at Respondent. In December 2002, I filed an EEOC charge of discrimination against Respondent. In May 2003, I entered into a settlement agreement with Respondent. Since that time, I have been subjected to harassment by a supervisor at Respondent. I was the target of an investigation of an inappropriate written note and the confidentiality of information in my personnel files was breached. On October 17, 2003, after I complained of harassment to the Governor's Whistle Blower Hotline, I was issued a disciplinary packet where I was cited for failure to fully cooperate with an investigation and conduct unbecoming an officer. Also, I have been told that I cannot speak Spanish to Spanish-speaking offenders at the facility.
>
> I believe I am being retaliated in violation of Title VII of the Civil Rights Act of 1964, as amended, and in violation of the Age Discrimination in Employment Act of 1967, as amended."

The defendant denied that any retaliation occurred and asserted that the disciplinary actions were all warranted. The defendant asserts that Holder was investigated in regards to the note because it was partially written in Spanish, and Holder speaks the language. The note was even sent to be analyzed by handwriting experts at the Illinois State Police forensics laboratory. The investigation was ultimately inconclusive, and it could not be proven that Holder drafted the note. The defendant also stated that the prohibition on Spanish communications with offenders was not specifically directed towards Holder, but was established under the theory that if staff were to communicate in Spanish with the youth offenders it could undermine security. Holder filed a union complaint over the Spanish issue, and sometime later he was allowed to communicate in Spanish with the youth offenders.

The next several years of Holder's employment were relatively uneventful, but Holder did apply for Youth Supervisor IV positions in 2004 and 2005. On both occasions he was denied the promotion. Then in 2008 the relationship between Holder and the IJCC began to worsen. Around that time, Holder underwent treatment for bladder cancer. When he returned to work he

was placed on light duty status, and he notified management that he should minimize the amount of time he spends standing. Holder was still required to stand for roll call every morning, despite the fact that another, Caucasian employee recuperating from cancer was allowed to sit through roll call. Holder was also punished and had his pay docked for missing roll call, while the Caucasian employee was never punished for missing roll call.

In 2009 Holder was investigated and reprimanded for multiple instances of alleged improper conduct involving outside visitors. Family and friends of youth offenders frequently visit the facility, and IYCH employees often interact with members of the public. Kurt Sutton, a Juvenile Justice Supervisory at IYCH, investigated the incident. The reprimand stated that on May 31, 2009 Holder spent 45 minutes reading a newspaper when he should have been supervising offenders and visitors in the visitation room. He was also reprimanded for actions that occurred on June 7, 2009, which included not inputting visitors into the computer database, denying visitors access to the facility because of their clothing when Holder should have reported his concerns to a supervisor, and conducting himself in an unprofessional manner with visitors. The alleged unprofessional conduct was detailed by handwritten letters sent to IYCH by three separate families. Additionally, Holder was reprimanded for insubordination during the investigation of the above incidents, and he was suspended for 25 days.

After the visitor incidents, Holder was again reprimanded in July, 2009 for having an unsecure vehicle in the facility parking lot. He had recently purchased a convertible from a coworker, and on occasion he would leave the convertible top down. On two separate days Holder's vehicle was searched by IYCH security because the top was left down. Kenneth Prather, the Chief of Security, even told Holder that he would continue to search his car.

However, other employees frequently parked jeeps in the facility parking with doors removed, and those employees did not have their vehicles searched or receive reprimands.

The last significant event prior to Holder's termination was the "Crispin" incident. On May 30, 2010 Holder was involved in an altercation with youth offender Cody Crispin. It was movie night that evening, and the Level 1 youth offenders were in the dayroom watching a movie. Crispin was also watching the movie, but he did not have Level 1 privileges and so he was supposed to be in his cell. After noticing Crispin watching the movie, he was told by Johnson and Holder to return to his cell. Holder escorted Crispin back to his cell, and sometime around then the two engaged in a verbal dispute. The argument became heated, Crispin placed Holder in a headlock, and Holder struck Crispin in the head. After the Crispin incident, the head of IYCH security, Rocky James, was overheard saying "We got that boy now." The decision to punish Holder after the incident was made in large part due to the testimony of Juvenile Justice Intern Tasha Johnson. However Johnson seemingly gave conflicting testimony to Rocky James regarding the incident, and there were inconsistences between the statements of the other witnesses.[2] The matter was referred to the Department of Children and Family Services ("DCFS") along with the Illinois State Police. After investigating the incident, DCFS found Holder not guilty of any violation. Information regarding to the incident was later presented to the Saline County State's Attorney's Office for possible criminal charges to be filed against Holder. The State's Attorney declined to prosecute.

---

[2] In Rocky James' May 30, 2010 "Investigational Interview" with Tasha Johnson, Johnson stated that she did not observe Crispin acting in an insolent manner prior to Crispin returning to his cell. However, Johnson stated that she went to the control room to wash her hands while Holder escorted Crispin to his cell. The inmate investigational interviews are inconsistent in regards to whether Crispin was insolent on the way to his cell, and as to whether Crispin or Holder initiated the physical altercation. For the purposes of summary judgment, factual disputes must be resolved in favor of the nonmoving party, i.e., Holder.

Around the time of the Crispin incident and investigation, IYCH began accepting applications for two Juvenile Justice Supervisor positions. Holder applied for the promotion and he was one of five applicants considered. According to the affidavit of Linda Butler, human resources representative at IYCH, the 2010 promotion process consisted of a point based evaluation of candidates, interviews, and a comparison of the candidates' seniority. Candidate interviews and scoring were conducted by Don Rumsey, Assistant Superintendent of Operations at IYCH, Wes Wilt of Illinois Youth Center Murphysboro, and Pat Dement, also of Illinois Youth Center Murphysbro. Patrick Mings and Eric VanZant ultimately received the promotions. Mings and VanZant both had more seniority than Holder and both scored significantly higher in the interview process.[3]

Holder's employment was ultimately terminated on July 28, 2010. According to Robert Price, who was the Superintendent at IYCH at the time of Holder's discharge, the decision to end Holder's employment was based on several factors, including the Crispin incident, the incidents with the facility visitors in 2009, four prior suspensions, and other reprimands and counselings. It was also ICYH policy that the decision to discipline employees should only be based on the employee's conduct that occurred within the past two years. Thus, using the older reprimands and counselings as a basis for Holder's termination was contrary to ICYH policy. And despite his termination, Holder performed well on performance reviews. Except for one instance of "needs improvement" in the area of time management, Holder's performance reviews from December, 2006 to April, 2010 stated that he always met or exceeded expectations.

---

[3] The "Juvenile Justice Supervisor Promotional Instrument" dated July 14, 2010, stated the following information about the five candidates:

| Test Score | Seniority Date | Applicant Name |
| --- | --- | --- |
| 56.33 | 05/13/96 (2) | Patrick Mings (promoted) |
| 50.66 | 11/09/99 (3) | Sonja M. Gregory |
| 47.66 | 06/19/95 (1) | Eric VanZant (promoted) |
| 40.33 | 04/01/96 | Wendell Vaughn |
| 18.33 | 09/21/98 | David Holder III |

Around the time Holder worked at IYCH, there were several other instances of IYCH staff members striking youth offenders. However, the other IYCH staff members who struck youth offenders were either not terminated or were terminated and reinstated to their positions. In 2000 Specialist Scott Dearing struck a youth offender in the mouth, in 2002 Ann Curd kicked and struck a youth offender, in 2008 Specialist Mark Stucker struck a youth offender while on camera, in 2011 Specialist John Smock and Bertis Trammel both struck youth offenders. None of those instances were reported to DCFS or to the Illinois State Police.

On March 7, 2011 Holder filed a discrimination complaint with the EEOC. The EEOC issued Holder a right to sue letter on August 27, 2012. In Holder's second amended complaint, he asserts the seven previously stated claims. Defendant IDJJ now seeks summary judgment.

## II.   ANALYSIS

When presented with a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). Without making any credibility determinations, the Court is required to view the facts in the light most favorable to the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Employers are prohibited from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). It is also unlawful for an employer to retaliate against an employee who has filed a discrimination charge. 42 U.S.C. § 2000e-3(a). Additionally, Title VII EEOC complaints must be filed "[w]ithin three hundred days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5. This means that "if a plaintiff does not file a charge concerning a discrete act of discriminatory conduct within

300 days of its occurrence, his claim is time-barred and he may not recover." *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-110 (2002)). Holder filed his EEOC complaint on March 7, 2011, and 300 days prior to that date is May 11, 2010.

Discrimination claims may be established using two methods; direct or indirect.[4] Holder may survive summary judgment under the direct method by "by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) Direct evidence typically takes the form of "smoking gun" type evidence. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013). This would essentially take the form of an admission that the defendant discriminated against Holder because of his race or retaliated against Holder because of his prior EEOC filings. The Seventh Circuit has remarked that "such admissions of illegal discrimination and retaliation are rare." *Id*. at 643. But a plaintiff can survive summary judgment under the indirect method by presenting a "convincing mosaic" of circumstantial evidence. Such evidence may include "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's

---

[4] The Seventh Circuit has suggested merging the direct and indirect method standards into one test. *See Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, concurring). The following standard was proposed; "[i]n order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason." *Id*.

reason is a pretext for discrimination." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (internal cites and quotes omitted).

To survive summary judgment under the indirect method, Courts apply the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, (1973). Under this method, Holder must first establish a prima facie case by showing: (1) that he is a member of a protected class; (2) that he met IDJJ's legitimate expectations; (3) that he suffered an adverse employment action; and (4) similarly situated employees outside of the protected classes were treated more favorably. *Smiley v. Columbia Coll. Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013). If Holder can establish a prima facie case, then the burden shifts to IDJJ to "identify a legitimate, nondiscriminatory reason for the termination." *Id*. If IDJJ can demonstrate a legitimate, nondiscriminatory reason for the termination, then the burden shifts back to Holder to produce sufficient evidence that the stated reason for termination was pretextual. *Id*.

Retaliation claims are also examined under the direct and indirect evidentiary frameworks. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). However for retaliation claims, the requirement that the plaintiff be a member of a protected class is instead a requirement that the plaintiff have engaged in a protected activity. *Id*.

### A. Wrongful Termination Claims

Holder argues that he can survive summary judgment for his retaliatory discharge claim (Claim 1) and discriminatory discharge claim (Claim 2) under both the direct and indirect methods. Turning to the direct method, Holder was clearly a member of a protected class, African American, and engaged in protected activity by filing EEOC complaints.

10

Holder can also establish causation under the "convincing mosaic" approach. He provides several examples of circumstantial evidence to support causation. First, Holder provides sufficient evidence to establish that similarly situated employees outside of the protective group receive better treatment. An affidavit from fellow IYCH employee Hollie Zertuche states that every other Youth Supervisor II / Juvenile Justice Specialists who struck an inmate was either reinstated to their position or not punished. Scott Dearing is one such employee who struck an inmate and was later reinstated to his position. Dearing also had 15 disciplinary actions against him over eight years of employment, and he was finally terminated because he assaulted a police officer outside of work. Details on Dearing and the other employees who hit youth inmates are scant in the record, but Dearing appears to be similarly situated to Holder.

Another piece of circumstantial evidence is Rocky James' statement of "We got that boy now." Use of the term "boy" to refer to an adult African American male may indicate racial animus. The Supreme Court held that the term "boy" by itself may be used in a racially pejorative sense, depending on factors such as "context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

The convincing mosaic is additionally supported by Holder's unwavering assertions that he struck Crispin in self-defense. Crispin's testimony to DCFS lends credence to this argument. Crispin stated that that he had Holder in a headlock prior to Holder striking him, and pursuant to IYCH institutional directives, IYCH staff may justifiably use force "to protect oneself or any other person from physical assaults, injury or death." Holder's assertions, combined with the fact that the eyewitness testimony was inconsistent, support the mosaic. If the defendants' explanation for Holder's termination was beyond reasonable dispute, then summary judgment would be appropriate on the wrongful termination claims. But Holder has demonstrated enough

evidence on his discrimination and retaliation claims (Claims 1 and 2) based on his termination from the IYCH to survive summary judgment. Because Holder can survive summary judgment using the direct method, the indirect method need not be addressed.

### B. Failure to Promote Claims

Defendant IDJJ is entitled to summary judgment on the failure to promote claims. Holder argues that the 2010 hiring process was discriminatory because he was previously denied TA positions, and because Rocky James ordered Hollie Zertuche to give Patrick Mings a stellar performance evaluation. But the two candidates who were hired, Mings and VanZant, both had more seniority than Holder. Mings and VanZant also scored significantly higher than Holder on the candidate scoring system, with scores of 56.33 and 47.66, respectively, compared to Holder's score of 18.33. Furthermore, two of the three candidate interviewers/reviewers were from the Illinois Youth Center in Murphysboro, thus appearing to limit potential bias. The 2010 hiring process also appears to use a different scoring metric than the promotion reviews Holder participated in during 2004 and 2005, and it is unclear to what extent the TA positions factored into the promotion decisions. Even if Holder had prior TA experience at that promotion level, Mings and VanZant would still have more seniority. And the disagreement between Hollie Zertuche and Rocky James in regards to Mings' performance evaluation is insufficient to create an inference that the promotion decision was discriminatory or retaliatory. The Federal Courts do not function as a "super-personnel department." *See Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005), *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999). Based on these facts, no reasonable jury

could infer that Holder was retaliated against or discriminated against in regards to the 2010 promotion process. The defendant is entitled to summary judgment on Claims 3 and 4.

### C. Other Discrimination and Retaliation Claims

Holder asserts that other conduct by the defendant was discriminatory, retaliatory, and contributed to a hostile work environment. Discrete retaliatory or discriminatory acts that occurred prior to May 11, 2010 are time barred. 42 U.S.C. § 2000e-5. But earlier acts can be used to support a hostile work environment claim. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). In sum, "the entire hostile work environment encompasses a single unlawful employment practice." *Id*. In order to survive summary a motion for summary judgment on a hostile work environment claim, the employee must demonstrate that "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability*." Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). Hostile work environment claims must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

Holder argues that the lack of TA positions, the 2003 note investigation, the Spanish speaking issue, being required to stand for roll call in 2008, the visitor investigation in 2009, the car searches in 2009, the denial of promotions, and the Crispin investigation were all

discriminatory in nature. All of the individual incidents except for the Crispin incident and the 2010 failure to promote claim are time barred for the purposes of Title VII, unless those incidents form the basis of a hostile work environment claim. But as a whole, no reasonable jury could find that the defendant's conduct constituted harassment so as to establish a hostile work environment claim. The investigations of the note, the visitor incidents, and the Crispin incident, along with the car searches, were all in response to legitimate institutional concerns. Holder may have been offended, but he cannot establish that the actions were objectively hostile or abusive. And Holder has failed to establish that the lack of TA positions, the denial of promotions, and being required to stand for roll call while on light duty status, as a whole, was subjectively and objectively hostile and abusive. The defendant is therefore entitled to summary judgment on Claims 5 and 6.

### D. Disparate Pay Claim

Holder's disparate pay claim overlaps with his failure to promote claim in all pertinent parts. In order to establish a Title VII disparate pay claim, the plaintiff must allege that their lower pay was a result of discrimination. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 656 (7th Cir. 2010). Holder's disparate pay claim is based on the fact that he was paid less than Caucasian employees because he was denied promotions because of his race. Because this claim is essentially the same as his failure to promote claims, the defendant is entitled to summary judgment on Holder's disparate pay claim, Claim 7.

### III. CONCLUSION

"[A]ll employees, not only perfect employees, are protected by Title VII." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 700 (7th Cir. 2013). The record surrounding Holder's termination

from the Illinois Youth Center at Harrisburg is full of contested material facts that preclude summary judgment. Therefore, he can proceed on his Title VII discriminatory discharge claim (Claim 1) and his Title VII retaliatory discharge claim (Claim 2) against the defendant. Defendant IDJJ is entitled to summary judgment on Holder's other claims.

SO ORDERED.

DATED:   December 18, 2014   .

s/Philip M. Frazier
PHILIP M FRAZIER
UNITED STATES MAGISTRATE JUDGE